IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| YVETTE L. JACKSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 19-CV-1030-SMY |
| | ) |
| EAST SAINT LOUIS BOARD OF | ) |
| EDUCATION DISTRICT 189 and | ) |
| ARTHUR R. CULVER, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Yvette L. Jackson filed the instant lawsuit against Defendants East Saint Louis Board of Education District 189 ("the District") and Arthur C. Culver. Plaintiff claims she was sexually harassed, retaliated against, constructively discharged, and discriminated against on account of her sex in violation of Title VII, 42 U.S.C. §2000e-5, *et seq*., and Illinois' Gender Violence Act ("IGVA"), 740 ILL.COMP.STAT. § 82/1, *et seq*. More specifically, Jackson alleges that during her employment as Director of Material Management for the District, she was harassed by Defendant Culver, the District's Superintendent, who showed her pornographic videos, made lewd and suggestive comments towards her, and subjected her to unwelcomed touching and gestures. She further alleges that she was constructively discharged and terminated from her employment because of the harassment and her complaints about the same.

Plaintiff filed a five-count Complaint against Defendants, asserting sexual harassment under Title VII of the Civil Rights Act of 1991 ("Title VII") (Count I), retaliation under Title VII (Count II), constructive discharge under Title VII (Count III), violation of the Illinois Gender Violence Act (Count IV), and racial discrimination and retaliation under Section 1981 of the Civil

Rights Act of 1991 (Count V) (Doc. 1).[1]  Now pending before the Court is Defendants' Motion for Summary Judgment (Doc. 60), which Plaintiff opposes (Doc. 67).[2]  For the following reasons, the Motion is **GRANTED in part and DENIED in part**.

## Background

Construed in the light most favorable to Jackson, the evidence and reasonable inferences establish the following facts relevant to the pending summary judgment motion: Jackson was hired as the District's Director of Material Management in December 1998.  In January 2015, the District reassigned her to the position of Director of Purchasing, Transportation, and Security.

In February 2017, Culver visited Jackson's office to view security video footage.  He closed the office door, sat atop her desk, opened his legs, and positioned his crotch directly in Jackson's face (Doc. 60-1 at 80-83).  He stayed in that position for approximately 15 to 20 minutes before noticing Jackson was uncomfortable and moving to a chair.  *Id*. at 84.  Jackson suffered a subsequent panic attack as a result of the incident.  *Id.* at 87; Doc. 1 at 3.

On another occasion in 2017, Culver visited Jackson in her office to gossip about an employee's involvement in a car accident (Doc. 60-1 at 88-91).  Culver mused that he could not "wake up for" the female employee, which Jackson understood to mean he could not achieve an erection for the woman due to her appearance.  *Id.* at 90.  Jackson reported this incident to the District's Board President, Kinnis Williams.  *Id.* at 92-93.

In the fall of 2017, Culver told Jackson that at a football game LaKeisha Adams, a female Board member, encouraged him to situate himself behind her as a quarterback, to "get up in there," and later began to straddle and hump a fence.  *Id.* at 105-08; Doc. 1 at 4.  Culver boasted about

---

[1] The Court dismissed Count IV as to the District and Count V in its entirety on November 6, 2019 (Doc. 35).
[2] Plaintiff's Response only addressed Counts I and II.  The Court construes her failure to respond to Defendants' request for summary judgment as to Counts III and IV as an admission to the merits of the motion as to those claims. Accordingly, summary judgment will be GRANTED as to those Counts.

Ms. Adams' sexual advances and demonstrated the sexual gestures she had made at the game (Doc. 60-1 at 105). He recounted and demonstrated this story three times to Jackson – twice in front of other employees. *Id.* at 106-07. Jackson reported this incident to Williams. *Id.* at 109. Sometime later that fall, Culver also told Jackson how Ms. Adams suggested giving a lap dance to him and Ms. Tina Frye. He commented that Ms. Adams "goes both ways", indicating she is bisexual. *Id.* at 104. Jackson reported this incident to Williams and Yulrie Tanner, her subordinate.

In early 2018 during a disciplinary hearing, Williams asked Jackson a question regarding a school incident. After she responded, Williams initiated a fist bump with Jackson. *Id.* at 94-96. Culver, who was sitting next to Jackson, then referred to Jackson as "my girl" and bumped her hip with his hand. *Id.* at 95-96. Jackson recoiled from the unwanted, unexpected touch. Williams told Jackson he saw Culver touch her and was in disbelief. *Id.* at 95.

In March 2018, while following Jackson to her office, Culver asked if she was losing weight on purpose. *Id.* at 98. Jackson responded that she was losing weight due to stress from the job. *Id.* Culver then told her, while looking at her rear end, "you don't want to lose too much from the wrong places." *Id.* at 99. Jackson told Williams and Tanner about this incident.

In April 2018, Culver approached Jackson and showed her two videos depicting sexual situations involving two District employees. Jackson characterizes the videos as "pornographic," while Defendants describe the videos as Public Service Announcements concerning the dangers of alcohol consumption and date-rape, which were designed for a college audience (Doc. 60-3 at 93-94). This incident occurred at the end of the workday when almost everyone had left the office (Doc. 60-1 at 32-33). Culver stopped Jackson before she left for the day to show her the videos. *Id.* The first video involved Terry Hawthorne, a District employee, and a temporary security guard who worked under Jackson. The video involved the two men and a female actress in a sexual

encounter. Jackson told Culver she thought the video was awful, but Culver proceeded to show her a second video. *Id.* at 33. The second video depicted a male and female mostly undressed and engaged in various sexual positions. *Id.* at 35. Culver then stated that if he was involved in a threesome, he would prefer two women. *Id.* at 37. Plaintiff told multiple people about this incident, including Board President Williams who inquired whether Culver mentioned the word "dick" during the incident, which Jackson confirmed. *Id.* at 38-39, 42.

Jackson testified that Culver subjected her to inappropriate conduct for three years on a regular basis. He would often come to Jackson's office. If anything sexual occurred in the District, he would make a point to visit her office to gossip. Jackson reported many of these inappropriate comments and incidents to Williams, Tanner, and other work colleagues. Culver's visits and conduct became so routine that it became a running joke with Tanner. She made numerous complaints about Culver's conduct and comments to other District staff, but never reported to the District's Human Resources Department ("HR"). Jackson explained that she "had no faith in [HR], because in every cabinet meeting that [she] was called up to, HR never ran anything. [Culver] ran HR so it was – wouldn't have done [her] any good to talk to HR." *Id.* at 41.

After Jackson reported the April 2018 incident to Williams and others, Culver ostracized her in the office and excluded her from regular meetings. *Id.* at 48-51. She was excluded from discussions on security matters and on one occasion, Tanner, her subordinate, was contacted in response to a security matter rather than Jackson. *Id.* at 49. At a District committee meeting, Culver excluded Jackson from the discussion despite questions concerning her department. *Id.* at 50. Culver's refusal to acknowledge Jackson's presence at that meeting shocked the committee chairwoman. *Id.*

Shortly thereafter, the personnel committee meeting agenda was changed at Culver's

direction to include the elimination of Jackson's position. *Id.* at 59-60. Usually, reductions in force measures, especially when concerning a director, are determined in March and finalized at the Board's April meeting. *Id.* at 60. According to Jackson, the May agenda and Board packages were finalized and distributed without her position being noted for elimination. *Id.* The day of the Board meeting, however, Culver had the agenda changed to reflect the termination of Jackson's position. *Id.* The on-duty security guards at the Board meeting called Jackson in disbelief when they discovered her position was soon to be eliminated. *Id.*

Sometime in May 2018, Culver expressed to Williams and Deputy Superintendent Devon Horton that he was angry with Jackson and "wanted nothing to do with her." *Id.* at 67-68. Board Member Irma Golliday reached out to Jackson to understand why Culver was angry with her. *Id.* at 70.

On May 14, 2018, the Board of Education adopted a resolution recommended by Culver honorably dismissing Jackson from her position (Doc. 67-5). The District and Culver cite economic necessity as a reason for Jackson's honorable dismissal and claim her termination saved the District approximately $47,000. *Id.*; Doc. 60-4 at 28. Plaintiff made $115,287.90 prior to her termination (Doc. 67-2).

Following Jackson's termination, the District hired Michael Hubbard as Supervisor of School Safety and Responsibility for $73,000, promoted Norquis Cooper to Supervisor of Transportation and increased her salary by $10,396, and hired a transportation liaison to work directly under Cooper at a salary of $31,419. *Id.* The total cost to the District in eliminating Jackson's position, creating new positions, and reassigning her job duties was $114,815—a difference of $472.90. *Id.*

As a result of Culver's actions, Jackson suffered from chronic stress which manifested in

reoccurring panic attacks, anxiety attacks, dangerously high blood pressure, and weight loss (Doc. 60-1 at 85-87, 98). She went to an emergency room three times from her stress-induced high blood pressure. *Id.* at 87.

## Discussion

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party is entitled to summary judgment where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986). Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

### Count I: Sexual Harassment Under Title VII

Title VII prohibits employers from discriminating against any individual because of their sex. 42 U.S.C. § 2000e-2(a)(1). To prevail on a sexual harassment claim, a plaintiff must prove that "(1) her work environment was objectively and subjectively offensive, (2) the harassment she complained of was based on her gender, (3) the conduct was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment, and (4) there is a basis for employer liability." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 880 (7th Cir. 2018); *accord Passananti v. Cook Cty.*, 689 F.3d 655, 664 (7th Cir. 2012).

The third element – severe or pervasive conduct – has an objective and subjective component. *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008). The plaintiff may satisfy the

subjective component by presenting evidence that she in fact perceived her workplace as hostile or abusive. *Id.* The objective component entails an examination of the totality of the circumstances. *Id*. More specifically, "[d]eciding whether a work environment is hostile requires consideration of factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016) (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)); *see also*, *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018). Under this standard, employers generally do not face liability for off-color comments, teasing, isolated incidents, and other unpleasantries that are, unfortunately, not uncommon in the workplace. *See Passananti*, 689 F.3d at 667; *Swyear*, 911 F.3d at 881-82.

Although certainly sexist and offensive, Culver's alleged comments and actions, individually or collectively, do not rise to the level of actionable harassment under prevailing Seventh Circuit standards. Even viewing the evidence in Jackson's favor, Culver made the comments sporadically, never made explicit invitations for sex, and was not physically threatening. Courts in this Circuit have found comments that were more sexually explicit and offensive than those alleged by Jackson not sufficiently severe to create a hostile work environment. For example, in *Baskerville v. Culligan International Co.*, 50 F.3d 428, 430 (7th Cir. 1995), the Seventh Circuit held that the alleged perpetrator calling the plaintiff "pretty girl"; grunting when she wore a leather skirt; suggesting she heated up his office; telling her that a P.A. system "attention" announcement meant that "All pretty girls run around naked"; implying that "pretty girls" at the office might make him "lose control"; insinuating that she and he had been "dancing, like in a night club"; and mentioning that it was lonely in his hotel and stating, with a gesture

suggesting masturbation, that all he had for company was a pillow, was not actionable sexual harassment. *Baskerville,* 50 F.3d at 430; s*ee also Milligan-Grimstad v. Stanley*, 877 F.3d 705, 713-14 (7th Cir. 2017). Culver's comments are "more reflective of run of the mill uncouth behavior than an atmosphere permeated with discriminatory ridicule and insult." *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005); *see also Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005) (affirming summary judgment where the evidence presented a handful of comments of a sexual nature, which were neither serious nor threatening).

Moreover, Culver made physical contact with Jackson on only one occasion – described as a brief, albeit unwanted, fist bump to her hip. Such contact does not constitute sexual harassment. *See*, *e.g.*, *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463-64 (7th Cir. 2002); *Henneman v. Airtran Airways*, 705 F.Supp.2d 1012, 1027 (E.D.Wis.2010) (finding a plaintiff's allegation that a coworker frequently walked behind where she and other female coworkers stood at a counter, turning sideways to brush his groin against them as he passed did not constitute severe enough conduct to be objectively offensive).

Because Culver's conduct cannot be considered severe or pervasive as a matter of law, Defendants are entitled to summary judgment with respect to Jackson's Title VII sexual harassment claims (Count I).

### Count II: Retaliation Under Title VII

Title VII also forbids an employer from discriminating against an employee who has "opposed any practice" made unlawful by Title VII or who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e–3(a). To establish a Title VII retaliation claim, a plaintiff must show: (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer;

and (3) there was a causal link between the protected expression and the adverse action. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). A Plaintiff may rely on circumstantial evidence such as "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual" to prove the causal link. *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to present a legitimate, non-discriminatory reason for the adverse employment action. *Allen v. Am. Signature, Inc.*, 272 Fed.Appx. 507, 511 (7th Cir. 2008). If the defendant presents a legitimate non-invidious reason, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual. *Id.*

Here, Jackson telling Board President Williams and other District employees about the April 2018 incident is protected activity. Relatedly, she testified that after she reported Culver's actions, he began to ostracize and exclude her at the workplace; that several District employees were shocked and confused by his actions; and that he told Williams and Deputy Superintendent Devon Horton that he was angry with Jackson and "wanted nothing to do with her." She also testified that approximately a month later, Culver changed the Board meeting agenda to eliminate her position. This is sufficient to create a material issue of fact as to a *prima facie* case.

Defendants maintain that Jackson's position was eliminated because of economic necessity. But Jackson argues that the stated reasons for her termination are pretextual. She points to evidence showing the timing of the decision to terminate her only a month after her complaint, the lack of savings after eliminating her position, and the failure to follow the Illinois School Code's requirements for reductions in force.

With respect to suspicious timing of adverse employment actions, "when there is corroborating evidence of retaliatory motive . . . an interval of a few weeks or even months may provide probative evidence of the required causal nexus." *Coleman v. Donahoe*, 667 F.3d 835, 861 (7th Cir. 2012). And there is evidence from which a jury could reasonably conclude that the savings the district realized from eliminating Jackson's position was negligible – less than $500. There is also evidence to suggest that Defendants failed to follow the requirements for reductions in force under Section 10-23.5 of the Illinois School Code, under which Purchasing Supervisor Yulrie Tanner, Plaintiff's direct subordinate, should have been dismissed, but was not. On this record, a jury could reasonably find Defendants' reasons for Jackson's termination were pretextual and retaliatory. Thus, Jackson's retaliation claim survives summary judgment.

## Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 60) is **GRANTED in part and DENIED in part**; Summary Judgment is **GRANTED** as to Counts I, III, and IV and **DENIED** as to Count II.

IT IS SO ORDERED.

DATED: November 22, 2021

2021.11.22
08:39:02
-06'00'

**STACI M. YANDLE**
**United States District Judge**